CROSNER LEGAL, P.C.
Craig W. Straub (SBN 249032)
craig@crosnerlegal.com
Kurt D. Kessler (SBN 327334)
kurt@crosnerlegal.com
9440 Santa Monica Blvd. Suite 301
Beverly Hills, CA 90210
Tel: (866) 276-7637
Fax: (310) 510-6429

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## EASTERN DIVISION

| | |
|---|---|
| MICHELE TUCKER, individually and on behalf of all others similarly situated, | Case No. |
| | **CLASS ACTION COMPLAINT** |
| Plaintiff, | JURY TRIAL DEMANDED |
| v. | |
| CONTINENTAL MILLS, INC., | |
| Defendant. | |

Plaintiff Michele Tucker ("Plaintiff" or "Ms. Tucker") on behalf of herself, all others similarly situated, and the general public, by and through her undersigned counsel, hereby brings this action against Continental Mills, Inc. ("Defendant"), and upon information and belief and investigation of counsel, alleges as follows:

### INTRODUCTION

1.      This is a consumer class action for violations of the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.* ("CLRA"), Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL"), and for breach of express warranty.

2.      Defendant manufactures, distributes, advertises, markets, and sells Krusteaz® Cinamon Swirl Crumb Cake & Muffin Mix in a gluten free and regular version (the "Products"). The packaging prominently displays on the front of the label the claim that these Products contain "**NO ARTIFICIAL Flavors · Colors · Preservatives**" (the "Representation"):

1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





2

3.      The "**NO ARTIFICIAL** . . . **PRESERVATIVES**" statement is false. The Products are made with manufactured Silicon Dioxide—an artificial preservative ingredient used in food and beverage products.

4.      The ingredients are listed on the back of the Product (regular version) in tiny print and list the following ingredients: CAKE MIX: Enriched bleached flour (wheat flour, niacin, reduced iron, thiamin mononitrate, riboflavin, folic acid), sugar, food starch-modified, soybean oil, leavening (baking soda, monocalcium phosphate, sodium aluminum sulfate), dextrose, salt, tapioca starch, arabic gum, xanthan gum, natural flavor. CINNAMON TOPPING: Sugar, palm and soybean oil, brown sugar, cinnamon, molasses powder, salt, silicon dioxide (anticaking agent), natural flavor.

5.      The ingredients are listed on the back of the Product (gluten free version) in tiny print and list the following ingredients: CAKE MIX: Sugar, whole grain sorghum flour, whole grain millet flour, food starch-modified soybean oil, arabic gum, guar gum, leavening (baking soda, sodium aluminum phosphate, monocalcium phosphate), natural flavor, salt, tapioca starch, xanthan gum. TOPPING: Sugar, Palm and Soybean Oil, Brown Sugar, Cinnamon, Salt, Silicon Dioxide (anticaking agent), natural flavor.

6.      Defendant's packaging, labeling, and advertising scheme is intended to give consumers the belief that they are buying a premium product that abides by the Representation.

7.      Plaintiff, who purchased the Products in California, was deceived by Defendant's unlawful conduct and brings this action on her own behalf and on behalf of consumers to remedy Defendant's unlawful acts.

## JURISDICTION AND VENUE

8.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which: (1) there are over 100

members in the proposed class; (2) members of the proposed classes of have a different citizenship from Defendant, a Washington corporation; and (3) the claims of the proposed class members exceed $5,000,000 in the aggregate, exclusive of interest and costs.

9.      The Products were sold to hundreds of class members during the putative class period—well over the 100 class members requirement.

10.     Defendant is a Washington company with its principal place of business in Washington and class members, including Plaintiff, are from states outside Wahsington. Thus, there is diversity under 28 U.S.C. § 1332(d).

11.     This litigation exceeds the $5 million requirement under 28 U.S.C. § 1332(d). *See e.g.*, *Montera v. Premier Nutrition Corp., No.* 16-CV-06980-RS, 2022 WL 10719057, at *3 (N.D. Cal. Oct. 18, 2022), *aff'd,* 111 F.4th 1018 (9th Cir. 2024) (noting lodestar alone after jury trial in a false and misleading labeling consumer protection action was $6,806,031.96).

12.     This Court has personal jurisdiction over Defendant because Defendant conducts and transacts business in the State of California, contracts to supply goods within the State of California, and supplies goods within the State of California. Defendant, on its own and through its agents, is responsible for the distribution, marketing, labeling, and sale of the Products in California, specifically in this judicial district. The marketing of the Products, including the decision of what to include and not include on the labels, emanates from Defendant. Thus, Defendant has intentionally availed itself of the markets within California through its advertising, marketing, and sale of the Products to consumers in California, including Plaintiff.

13.     The Court also has specific jurisdiction over Defendant as it has purposefully directed activities towards the forum state, Plaintiff's claims arise out of those activities, and it is reasonable for Defendant to defend this lawsuit

because it has sold deceptively advertised Products to Plaintiff and members of the Class in California. By distributing and selling the Products in California, Defendant has intentionally and expressly aimed conduct at California which caused harm to Plaintiff and the Class that Defendant knows is likely to be suffered by Californians.

14.    Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this District. Plaintiff purchased the Products within this District.

**PARTIES**

15.    Defendant is a Washington corporation that maintains its principal place of business in Washington. At all times during the class period, Defendant was the manufacturer, distributor, marketer, and seller of the Products. Defendant sells its Products in large retail stores nationwide and in California including Walmart, Ralphs, Target, Vons, and online via amazon.com and Instacart. No matter where the Products are sold, they contain the same alleged deceptive Representation.

16.    Plaintiff is a resident of Riverside County, California. Plaintiff purchased the Products at retail stores in California during the class period. Plaintiff relied on Defendant's deceptive advertising and labeling claims as set forth herein.

**ADDITIONAL FACTUAL ALLEGATIONS**

17.    The front label of the Product prominently states that there are "**NO ARTIFICIAL . . . PRESERVATIVES**" the thereby misleading reasonable consumers into believing that the Products do not contain any artificial preservative ingredients. However, the Products contain an artificial preservative called Silicone Dioxide.

18.    Studies show a growing number, if not a majority of, consumers choose foods made with clean ingredients.[1] In 2024, the global clean label ingredients market size was $44 billion.[2] As such, tapping into the clean label market is important to a company's growth and bottom line.[3]

19.    Indeed, it is well documented that manufacturers charge and consumers are willing to a pay a premium for products with clean ingredients (e.g., those that lack artificial ingredients).[4]

20.    Consumer research has found that 82% of U.S. respondents believe that foods with artificial ingredients are less healthy than their all-natural counterparts.[5]

---

[1] *IFIC Survey: From "Chemical-sounding" to "Clean": Consumer Perspectives on Food Ingredients*, FOOD INSIGHT (June 17, 2021), *available at* https://foodinsight.org/ific-survey-from-chemical-sounding-to-clean-consumer-perspectives-on-food-ingredients/; Alverson, Chloe, *Consumer trends continue to prioritize clean label, non-GMO beverages*, BEVERAGE INDUSTRY, *available at* https://www.bevindustry.com/articles/96687-consumer-trends-continue-to-prioritize-clean-label-non-gmo-beverages.

[2] *Clean Label Ingredient - Market Share Analysis, Industry Trends & Statistics, Growth Forecasts (2024 - 2029)* (synopsis), MORDOR INTELLIGENCE, *available at* https://www.researchandmarkets.com/reports/4771850/clean-label-ingredient-market-share-analysis?w=5; *Clean Label Ingredients Market is Projected to Reach US$ 125.5 Billion and a Dynamic CAGR of 4.2% by 2030*, PERSISTENCE MARKET RESEARCH (Jan. 18, 2024), *available at* https://www.globenewswire.com/en/news-release/2024/01/18/2811262/0/en/Clean-Label-Ingredients-.

[3] *Uncovering the clean label connection to business grow* (May 16, 2022), *available at* https://www.ingredion.com/na/en-us/be-whats-next/growth-with-clean-label.html; *Uncovering the clean label connection to business growth*, INGREDION (May 16, 2022), *available at* https://www.ingredion.com/na/en-us/be-whats-next/growth-with-clean-label.html.

[4] *The Truth About Clean Label — and Why It Matters*, PERDUE FOOD SERVICE (Oct. 18, 2021), *available at* https://www.perduefoodservice.com/resources/trends-insights/the-truth-about-clean-label-and-why-it-matters/; Jacobsen, Jessica, *Consumer awareness of clean label drives demand for ingredient solutions*, BEVERAGE INDUSTRY, *available at* https://www.bevindustry.com/articles/95110-consumer-awareness-of-clean-label-drives-demand-for-ingredient-solutions.

[5] Kavanaugh J., The Future of Artificial Flavors & Ingredients. Forevest, Industry News, Flavor & Fragrance Industry (June 12, 2017) available at

21.     Defendant takes advantage of consumers by labeling the Products as containing "No Artificial Preservatives" even though the Products contain an artificial preservative. It does this to increase sales.

### THE SILICON DIOXIDE IN THE PRODUCT IS ARTIFICIAL

22.     The Silicon Dioxide in the Products is "artificial." Dictionary definitions define "artificial" as something made by man. For example, "artificial" is defined as "made by human skill; produced by humans …"[6] Merriam-Webster's online dictionary states that "artificial" means "humanly contrived …"[7] Cambridge Dictionary states that "artificial" means "made by people, often as a copy of something natural."[8]

23.     Consumer perception of the word "artificial" is in-line with the dictionary definitions. That is, a consumer expects a "No Artificial Preservative" claim to mean that any preservative ingredient in the food is in its natural state and has not been modified in some way.[9]

24.     Here, the Silicone Dioxide in the Products is artificial because it is made using synthetic processing.

---

https://foreverest.net/news-list/the-future-of-artificial-flavors-ingredients (citing International, S. S. (2015, October 1). National study by Instantly reveals many Americans do not trust large companies – instantly. Retrieved January 26, 2017, from Press Releases

[6] *Artificial,* DICTIONARY.COM, *available at* https://www.dictionary.com/browse/artificial

[7] *Artificial*, MERRIAM-WEBSTER'S DICTIONARY, available at https://www.merriam-webster.com/dictionary/artificial

[8] *Artificial*, CAMBRIDGE DICTIONARY, available at https://dictionary.cambridge.org/us/dictionary/english/artificial

[9] *Artificial Foods*. ENCYCLOPEDIA.COM. available at https://www.encyclopedia.com/food/encyclopedias-almanacs-transcripts-and-maps/artificial-foods

25. Silicon Dioxide ($SiO_2$) in food products, including the Products, is synthetically manufactured (e.g., it is "artificial").[10] "Food-grade silicon dioxide" is known as a "synthetic" compound.[11]

26. Food grade Silicon Dioxide is amorphous (non-crystalline), which is considered safer than crystalline forms (like quartz). Crystalline forms of Silicon Dioxide are not utilized in the food industry because workers at the manufacturing plant are exposed to serious health hazards from breathing the small crystalline particles.[12] Food-grade Silicon Dioxide, like the Silicon Dioxide in the Products, is considered artificial and synthetic.

27. Safety Data Sheets note that food-grade Silicon Dioxide is "chemically prepared."[13] Food-grade Silicon Dioxide manufacturers state "Silicon Dioxide (SiO2) is a white, high purity, tasteless, odorless, easy dispersion, ***chemical powder*** produced by the precipitation of sodium silicate with sulfuric acid through hydrolysis."[14]

28. Silicon Dioxide for foods is "meticulously ***manufactured*** through a controlled precipitation process."[15]

---

[10] *See* Lamas B, Martins Breyner N, Malaisé Y, Wulczynski M, Galipeau HJ, Gaultier E, Cartier C, Verdu EF, Houdeau E. *Evaluating the Effects of Chronic Oral Exposure to the Food Additive Silicon Dioxide on Oral Tolerance Induction and Food Sensitivities in Mice.* Environ Health Perspect. 2024 Feb;132(2):27007. doi: 10.1289/EHP12758. Epub 2024 Feb 21. PMID: 38380914

[11] *Id.*

[12] U.S. Department of Labor, Occupational Safety and Health Administration, *Silica, Crystalline* available at https://www.osha.gov/silica-crystalline/health-effects#:~:text=Breathing%20in%20very%20small%20(%22respirable,COPD)%2C%20and%20kidney%20disease.

[13] https://www.univarsolutions.com/zeofree-5162-silicon-dioxide-16166394

[14] https://e-milagro.com/products/silica/

[15] RawPharma, *Precipitated Silicon Dioxide Food Grade 1Kg Pack* available at https://rawpharmabiz.com/precipitated-silicon-dioxide-food-1kg-

CLASS ACTION COMPLAINT

29.    "Food-grade $SiO_2$ is produced either thermally (e.g., fumed $SiO_2$) or through wet chemistry (e.g., $SiO_2$gel and precipitated $SiO_2$ (OECD, 2004)."[16] "The worldwide production of $SiO_2$ in 2000 was 432,900 tons, with ~ 90% reported to be SAS for food industry and other sectors (OECD, 2004)."[17] "The production, use, and end-of-life disposal of food-grade $SiO_2$ can lead to direct and indirect exposure of humans and the environment (Hansen et al., 1999, van Kesteren et al., 2014), and there are emerging concerns about its potential risk to humans and ecosystems (Maynard, 2014)."[18] This health concern is why the FDA does not allow Silicon Dioxide to be in any food above two precent by weight. 21 C.F.R. § 172.480(b)(4).

30.    The FDA states that "[t]he food additive silicon dioxide . . . is manufactured by vapor phase hydrolysis or by other means whereby the particle size is such as to accomplish the intended effect." 21 C.F.R. § 172.480(a).

31.    Food grade Silicon Dioxide is synthetically created. "Silicon dioxide is synthetically obtained from a vapor-phase hydrolysis reaction producing fumed silica. Another process to obtain synthetic amorphous silica is through a wet process to form hydrous silica."[19]

---

pack?srsltid=AfmBOooNn6PUYsJaeh-L8q6qbPsAhwXuL0TQ0xn2GBfadZLUB3U1yRa8

[16] Yu Yang, James J. Faust, Jared Schoepf, Kiril Hristovski, David G. Capco, Pierre Herckes, Paul Westerhoff, *Survey of food-grade silica dioxide nanomaterial occurrence, characterization, human gut impacts and fate across its lifecycle*, SCIENCE OF THE TOTAL ENVIRONMENT. 2016; 565:902-912, ISSN 0048-9697.

[17] *Id.*

[18] *Id.*

[19] Bakerpedia, *Silicon Dioxide Also known as synthetic amorphous silica (SAS)*, AMERICAN SOCIETY OF BAKING Available at https://dev.bakerpedia.com/ingredients/silicon-dioxide/

CLASS ACTION COMPLAINT

32.     Since 90% of the world's food grade Silicon Dioxide is "Synthetic Amorphous Silica" commonly referred to as "SAS,"[20] it is highly likely that the Silicon Dioxide in the Products is SAS. [21] Here, it is even more likely that the Products use SAS because SAS is used as an "anticaking agent."[22] Non-nanostructured alternatives (which are also artificial as explained above) usually employ a completely different mode of action and in many cases do not perform as well as SAS as both anticaking agents and free-flow aids.[23] Thus, higher dosage of additives is necessary.[24] Here, it is extremely likely (above 90%) that the Products contain Synthetic Amorphous Silica since it is used in a small dosage for anticaking preservative purposes. As the name indicates it is "Synthetic" which means it is artificial.

33.     Synthetic Amorphous Silica is manufactured through controlled processes such as: Precipitated silica which is made by reacting sodium silicate with acid; Fumed (pyrogenic) silica which is made by burning silicon tetrachloride in a hydrogen-oxygen flame; and Silica gel which is made by polymerizing silicic acid.[25] All of these processes are synthetic (i.e., artificial).

---

[20] *Supra*, note 16 (Yu Yang, James J. Faust, Jared Schoepf, Kiril Hristovski, David G. Capco, Pierre Herckes, Paul Westerhoff, *Survey of food-grade silica dioxide nanomaterial occurrence, characterization, human gut impacts and fate across its lifecycle*, Science of The Total Environment. 2016; 565:902-912, ISSN 0048-9697).

[21] Evonik Silica, Essential, Sustainable, and Safe, Industry Brochure 319 available at https://products.evonik.com/assets/28/44/IB_319_Evonik_silica_essential_sustainable_safe_EN_Asset_482844.pdfhttps://products.evonik.com/assets/28/44/IB_319_Evonik_silica_essential_sustainable_safe_EN_Asset_482844.pdf

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] Fruijtier-Pölloth C. T*he safety of nanostructured synthetic amorphous silica (SAS) as a food additive (E 551).* ARCH TOXICOL. 2016 Dec;90(12):2885-2916.

34.     Synthetic amorphous silica is artificial because it is "intentionally manufactured" rather than occurring naturally.[26] Unlike crystalline silica, which is found in nature (such as quartz which is not in the Products), SAS is engineered to be highly pure and crystalline-free. It comes in different forms, including pyrogenic (fumed) silica, precipitated silica, silica gel, and colloidal silica.

35.     Commercial Synthetic Amorphous Silica, or Silicon Dioxide, can have a range of very fine silica particles down in the nano range. Commercial food-grade silica can contain nanoparticles, specifically synthetic amorphous silica (SAS), which is widely used as an anticaking agent in food products.[27] Studies have confirmed the presence of nano silica (E551) in commercial food items, though its particle size and morphology are not always disclosed on labels.[28]

36.     Whether Defendant uses either non-crystalline food grade Silicon Dioxide or Synthetic Amorphous Silica variety does not matter since both are created by a synthetic and artificial process making the Silicon Dioxide in the Products artificial.

37.     Accordingly, the "No Artificial Preservatives" claim on the labels of the Products is false and misleading.

doi: 10.1007/s00204-016-1850-4. Epub 2016 Oct 3. PMID: 27699444; PMCID: PMC5104814.

[26] Association of Synthetic Amorphous Silica Producers, *Synthetic Amorphous Silica explained* available at https://www.asasp.eu/about-sas/what-is-sas/

[27] Athinarayanan, J., Periasamy, V.S., Alsaif, M.A. et al. P*resence of nanosilica (E551) in commercial food products: TNF-mediated oxidative stress and altered cell cycle progression in human lung fibroblast cells*. CELL BIOL TOXICOL 30, 89–100 (2014). https://doi.org/10.1007/s10565-014-9271-8

[28] *Id.*

1    **THE SILICONE DIOXIDE IN THE PRODUCTS FUNCTIONS AS A PRESERVATIVE**

2          38.    The FDA defines a preservative as "any chemical that, when added

3    to food, tends to prevent or retard deterioration thereof, but does not include

4    common salt, sugars, vinegars, spices, or oils extracted from spices, substances

5    added to food by direct exposure thereof to wood smoke, or chemicals applied for

6    their insecticidal or herbicidal properties." 21 C.F.R. §101.22(a)(5).

7          39.    The FDA lists Silicon Dioxide as an anticaking agent, antioxidant,

8    and humectant, among other things.[29]

9          40.    Anticaking agents prevent foods from sticking together and ensuring

10   a product remains dry and free-flowing[30], antioxidants impede rotting[31], and

11   humectants prevent things from drying out. [32]

12         41.    By acting as an anti-caking agent (which Defendant specifically

13   notes as its function on the back label), antioxidant, and humectant, Silicon

14   Dioxide preserves the shelf-life of the Products and thus acts as a preservative, as

15   it tends to prevent or retard deterioration. Silicon Dioxide is a preservative

16   because it supports reductions in oxidation or moisture by its properties as

17   discussed below.

18         42.    Silicon Dioxide's ability to control moisture and prevent clumping

19   directly contributes to food preservation. *See* 21 C.F.R. §101.22(a)(5) (defining

20

21   ─────────────

22   [29]
     https://www.hfpappexternal.fda.gov/scripts/fdcc/index.cfm?set=FoodSubstances
23   &id=SILICONDIOXIDE

24   [30] The Basics of Anti-Caking Agents,
     https://www.ulprospector.com/knowledge/3306/fbn-the-basics-of-anti-caking-
25   agents.

26   [31] Antioxidants versus Food Antioxidant Additives and Food Preservatives
     https://pmc.ncbi.nlm.nih.gov/articles/PMC6912551/.

27   [32]What are humectants, https://www.12taste.com/blogs/what-are-humectants-
     and-why-are-they-used-in-food-processing/.
28

preservatives as "any chemical that, when added to food, *tends to* prevent or retard deterioration"); *see also* Merriam-Webster's Dictionary (defining "preservative" as "something that preserves or *has the power of preserving*.").[33]

43.    Incorporation of precipitated Silicon Dioxide contributes to the stabilization of emulsions and suspensions, aiding in the maintenance of consistent textures and appearances in a range of food products. Its presence in dressings, sauces, and dairy-based products helps ensure that these formulations remain visually appealing and enjoyable to consumers over their intended shelf life.[34]

44.    Silicon Dioxide is highly adsorbent, meaning it can attract and hold moisture. By keeping products dry, it: (1) slows microbial growth (since many microbes need moisture); (2) prevents clumping in powdered goods; and (3) increases shelf life indirectly by maintaining texture and usability.

45.    Silicon dioxide slows microbial growth by controlling moisture levels. Many microbes require moisture to thrive, so by keeping food products dry, silicon dioxide helps limit conditions that would otherwise support bacterial or fungal growth. Silicon Dioxide's role as an anticaking agent in powdered foods, like the Products, contributes to preservation by reducing humidity-related spoilage.[35]

---

[33] *Preservative,* MERRIAM-WEBSTER'S DICTIONARY, *available at* https://www.merriam-webster.com/dictionary/preservative?utm_campaign=sd&utm_medium=serp&utm_source=jsonld

[34] RawPharma, *Precipitated Silicon Dioxide Food Grade 1Kg Pack* available at: https://rawpharmabiz.com/precipitated-silicon-dioxide-food-1kg-pack?srsltid=AfmBOooNn6PUYsJaeh-L8q6qbPsAhwXuL0TQ0xn2GBfadZLUB3U1yRa8

[35] Ahmadi-Nouraldinvand, F., Sharifi, R.S., Siadat, S.A. et al. *Fascinating Role of Silicon dioxide Nanoparticles and Co-inoculation of Mycorrhiza and Rhizobacteria to Combat NaCl Stress: Changes in Physiological Characteristics, Uptake of Nutrient Elements, and Enhancing Photosystem II Activities in Wheat.*

13

46.    Silicon Dioxide functions as a preservative in the Products regardless of whether Defendant intended to use it as a preservative. Silicon Dioxide functions as a preservative even if it is also added to the Products for some other use. *See* 21 C.F.R. §101.22(a)(5) (defining preservatives as "any chemical that, when added to food, *tends to* prevent or retard deterioration") (emphasis added); *see also* Merriam-Webster's Dictionary (defining "preservative" as "something that preserves or *has the power of preserving*.") (emphasis added).[36]

47.    Thus, Silicone Dioxide is functioning as a preservative in the Product.

**REASONABLE CONSUMERS ARE DECEIVED BY DEFENDANT'S FALSE LABELING STATEMENT AND SUFFERED ECONOMIC INJURY**

48.    Consumers, like Plaintiff, relied on Defendant's Representation when purchasing the Products.

49.    The Representation on the labels of the Products is material to reasonable consumers. "[F]oods bearing 'free-from' claims are increasingly relevant to Americans, as they perceive the products as closely tied to health … 84 percent of American consumers buy free-from foods because they are seeking out more natural or less processed foods. In fact, 43 percent of consumers agree that free-from foods are healthier than foods without a free-from claim, while another three in five believe the fewer ingredients a product has, the healthier it is (59 percent). Among the top claims free-from consumers deem most important are trans-fat-free (78 percent) and preservative-free (71 percent)."[37]

---

J SOIL SCI PLANT NUTR 24, 277–294 (2024). https://doi.org/10.1007/s42729-024-01640-0

[36] *Preservative,* MERRIAM-WEBSTER'S DICTIONARY, *available at* https://www.merriam-webster.com/dictionary/preservative?utm_campaign=sd&utm_medium=serp&utm_source=jsonld

[37] *84% of Americans buy "free-from" foods because they believe them to be more natural or less processed*, MINTEL (Sept. 3, 2015), *available at*

14

50.     Plaintiff and the putative class members suffered economic injury as a result of Defendant's actions. Plaintiff and putative class members spent money that, absent Defendant's actions, they would not have spent. Plaintiff and putative class members are entitled to damages and restitution for the purchase price or the price attributable to the deceptive Representation. Consumers, including Plaintiff, would not have purchased Defendant's Products, or would have paid less for the Products, if they had known the Products actually contain an artificial preservative ingredient.

### MS. TUCKER'S PURCHASE OF THE PRODUCTS

51.     Ms. Tucker purchased the Krusteaz® Cinamon Swirl Crumb Cake & Muffin Mix (regular version) at a Vons retail store near her home in Menifee, California for approximately $4.00 per package in the past three years. Her last purchase is estimated to be in the middle of 2024.

52.     When purchasing the Product, Ms. Tucker saw and relied on the "**NO ARTIFICIAL Flavors · Colors · Preservatives**" statement on the front of the packaging. Ms. Tucker would not have purchased the Product, or would have paid less for the Product, had she known that the Product actually contains the artificial preservative Silicon Dioxide in direct contradiction to Defendant's "No Artificial Preservatives" promise. Like other consumers, Ms. Tucker did not expect that Defendant would place a false statement about its crumb cake mix on the front of the package. Ms. Tucker believes that it is not right for Defendant to lie to its customers.

53.     As a result, Plaintiff suffered injury in fact when she spent money to purchase the Product she would not have purchased, or would have paid less for, absent Defendant's misconduct.

_____

https://www.mintel.com/press-centre/84-of-americans-buy-free-from-foods-because-they-believe-them-to-be-more-natural-or-less-processed/

54.     Ms. Tucker desires to purchase the Product again if the labels of the Products were accurate and if the Products actually were free from artificial preservatives or if the label no longer contained the deceptive Representation. However, as a result of Defendant's ongoing misrepresentations, Ms. Tucker is unable to rely on the Products' advertising and labeling when deciding in the future whether to purchase the Products. Further, Ms. Tucker is not a food scientist and will not know if the Products are re-formulated to truthfully contain no artificial preservatives making her at imminent risk of being harmed.

55.     As shown above, the manufacturing processes for Silicon Dioxide are complicated and cannot be determined without knowledge of food chemistry.

## NO ADEQUATE REMEDY AT LAW

56.     Plaintiff and members of the class are entitled to equitable relief as no adequate remedy at law exists. The statutes of limitations for the causes of action pled herein vary. Class members who purchased the Products more than three years prior to the filing of the complaint will be barred from recovery if equitable relief were not permitted under the UCL.

57.     Legal remedies that require more "stringent" proof, and are therefore harder to obtain, are not "equally prompt and certain."

58.     Plaintiff is pleading the UCL claim in the alternative and asserts entitlement to equitable relief to recover the amounts paid for the Product to the extent those amounts (in whole or in part) are deemed not recoverable as damages for Plaintiff's legal claims.

59.     Plaintiff lacks an adequate remedy at law if the amount of damages is less than the price paid for the goods and restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies.

60.     Damages might be deemed not recoverable for Plaintiff's legal claims—specifically, because the UCL claim covers more conduct and therefore

may be less burdensome to prove. This is because the scope of actionable misconduct under the unfair prong of the UCL is broader than the other causes of action asserted herein, and may be less burdensome to prove than the CLRA and breach of express warranty. It includes Defendant's overall unfair marketing scheme to promote and brand the Products, across a multitude of media platforms, including the product labels, packaging, and online advertisements, over a long period of time, in order to gain an unfair advantage over competitor products without the deceptive claims.

61.     Plaintiff and class members may also be entitled to restitution under the UCL, while not entitled to damages under other causes of action asserted herein (e.g., the CLRA is limited to certain types of plaintiffs (an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes) and other statutorily enumerated conduct).

62.     A primary litigation objective in this litigation is to obtain injunction requiring Defendant to remove the false "No Artificial Preservatives" statement on the label of the Products. Injunctive relief is appropriate on behalf of Plaintiff and members of the class because Defendant continues to misrepresent the Products with the Representation when the Products actually contain an artificial preservative ingredient.

63.     Injunctive relief is necessary to prevent Defendant from continuing to engage in the unfair, fraudulent, and/or unlawful conduct described herein and to prevent future harm—none of which can be achieved through available legal remedies (such as monetary damages to compensate past harm).

64.     Injunctive relief, in the form of affirmative disclosures or halting the sale of unlawful sold products is necessary to dispel the public misperception about the Products that has resulted from years of Defendant's unfair, fraudulent, and unlawful marketing efforts. Such disclosures would include, but are not limited to,

publicly disseminated statements stating that the Products actually contain an artificial preservative ingredient. An injunction requiring affirmative disclosures to dispel the public's misperception, and prevent the ongoing deception and repeat purchases, is also not available through a legal remedy (such as monetary damages).

65.    Further, because a public injunction is available under the UCL, and damages will not adequately benefit the general public in a manner equivalent to an injunction.

66.    It is premature to determine whether an adequate remedy at law exists. No discovery has been conducted, and no expert reports have been exchanged. Defendant's internal documents may provide insight into different damages theories such as restitution in the form of the profits gained attributable to the conduct at issue.

## CLASS ACTION ALLEGATIONS

67.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of the following Class:

**Nationwide Class**
All U.S. citizens who purchased the Products in their respective state of citizenship for personal and household use and not for resale within the applicable statute of limitations and until the date class notice is disseminated.

**California Subclass**
All California citizens who purchased the Products in California for personal and household use and not for resale within the applicable statute of limitations and until the date class notice is disseminated.

(collectively, the "Class")

68.    Excluded from the class are: (i) Defendant and its officers, directors, and employees; (ii) any person who files a valid and timely request for exclusion; (iii) judicial officers and their immediate family members and associated court

staff assigned to the case; (iv) individuals who received a full refund of the Products from Defendant.

69.    Plaintiff reserves the right to amend or otherwise alter the class definition presented to the Court at the appropriate time, or to propose or eliminate subclasses, in response to facts learned through discovery, legal arguments advanced by Defendant, or otherwise.

70.    The Class is appropriate for certification because Plaintiff can prove the elements of the claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

71.    Numerosity: Class Members are so numerous that joinder of all members is impracticable. Plaintiff believes that there are thousands of consumers who are Class Members described above who have been damaged by Defendant's deceptive and misleading practices.

72.    Commonality: There is a well-defined community of interest in the common questions of law and fact affecting all Class Members. The questions of law and fact common to the Class Members which predominate over any questions which may affect individual Class Members include, but are not limited to:

a.    Whether Defendant is responsible for the conduct alleged herein which was uniformly directed at all consumers who purchased the Products;

b.    Whether Defendant's misconduct set forth in this Complaint demonstrates that Defendant engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sale of the Products;

c.    Whether Defendant made misrepresentations concerning the Products that were likely to deceive the public;

d.    Whether Plaintiff and the Class are entitled to injunctive relief;

19

e.      Whether Plaintiff and the Class are entitled to money damages and/or restitution under the same causes of action as the other Class Members.

73.     Typicality: Plaintiff is a member of the Class that Plaintiff seeks to represent. Plaintiff's claims are typical of the claims of each Class Member in that every member of the Class was susceptible to the same deceptive, misleading conduct and purchased the Products. Plaintiff is entitled to relief under the same causes of action as the other Class Members.

74.     Adequacy: Plaintiff is an adequate Class representative because Plaintiff's interests do not conflict with the interests of the Class Members Plaintiff seeks to represent; the consumer fraud claims are common to all other members of the Class, and Plaintiff has a strong interest in vindicating the rights of the class; Plaintiff has retained counsel competent and experienced in complex class action litigation and Plaintiff intends to vigorously prosecute this action. Plaintiff has no interests which conflict with those of the Class. The Class Members' interests will be fairly and adequately protected by Plaintiff and proposed Class Counsel. Defendant has acted in a manner generally applicable to the Class, making relief appropriate with respect to Plaintiff and the Class Members. The prosecution of separate actions by individual Class Members would create a risk of inconsistent and varying adjudications.

75.     The Class is properly brought and should be maintained as a class action because a class action is superior to traditional litigation of this controversy. A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

a.      The joinder of hundreds of individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

b.    The individual claims of the Class Members may be relatively modest compared with the expense of litigating the claim, thereby making it impracticable, unduly burdensome, and expensive to justify individual actions;

c.    When Defendant's liability has been adjudicated, all Class Members' claims can be determined by the Court and administered efficiently in a manner far less burdensome and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

d.    This class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of Class claims;

e.    Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action;

f.    This class action will assure uniformity of decisions among Class Members;

g.    The Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation; and

h.    Class Members' interests in individually controlling the prosecution of separate actions is outweighed by their interest in efficient resolution by single class action;

76.    Additionally or in the alternative, the Class also may be certified because Defendant has acted or refused to act on grounds generally applicable to the Class thereby making final declaratory and/or injunctive relief with respect to the members of the Class as a whole, appropriate.

77.    Plaintiff seeks preliminary and permanent injunctive and equitable relief on behalf of the Class, on grounds generally applicable to the Class, to enjoin and prevent Defendant from engaging in the acts described, and to require Defendant to provide full restitution to Plaintiff and the Class members.

78.    Unless the Class is certified, Defendant will retain monies that were taken from Plaintiff and Class members as a result of Defendant's wrongful conduct. Unless a classwide injunction is issued, Defendant will continue to commit the violations alleged and the members of the Class and the general public will continue to be misled.

**FIRST CLAIM FOR RELIEF**

**Violation of California's Consumers Legal Remedies Act**

**Cal. Civ. Code §§ 1750,** *et seq.*

79.    Plaintiff realleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

80.    Plaintiff brings this claim under the CLRA individually and on behalf of the California Subclass against Defendant.

81.    At all times relevant hereto, Plaintiff and the members of the Class were "consumer[s]," as defined in California Civil Code section 1761(d).

82.    At all relevant times, Defendant was a "person," as defined in California Civil Code section 1761(c).

83.    At all relevant times, the Products manufactured, marketed, advertised, and sold by Defendant constituted "goods," as defined in California Civil Code section 1761(a).

84.    The purchases of the Products by Plaintiff and the members of the Class were and are "transactions" within the meaning of California Civil Code section 1761(e).

85.    Defendant disseminated, or caused to be disseminated, through its advertising, false and misleading representations, including the Products' labeling that the Products with the Representation. Defendant failed to disclose that the Products contain an artificial preservative ingredient. This is a material misrepresentation and omission as reasonable consumer would find the fact that

the Products contain an artificial preservative ingredient to be important to their decision in purchasing the Products. Defendant's Representation violates the CLRA in the following ways:

a)    Defendant represented that the Products have characteristics, ingredients, uses, and benefits which they do not have (Cal. Civ. Code § 1770(a)(5));

b)    Defendant represented that the Products are of a particular standard, quality, or grade, which they are not (Cal. Civ. Code § 1770(a)(7));

c)    Defendant advertised the Products with an intent not to sell the Products as advertised (Cal. Civ. Code § 1770(a)(9)); and

d)    Defendant represented that the subject of a transaction has been supplied in accordance with a previous representation when it has not (Cal. Civ. Code § 1770(a)(16)).

86.    Defendant violated the CLRA because the Products were prominently advertised with the Representation but, in reality, the Products contain an artificial preservative. Defendant knew or should have known that consumers would want to know that the Products contain an artificial preservative.

87.    Defendant's actions as described herein were done with conscious disregard of Plaintiff's and the Class members' rights and were wanton and malicious.

88.    Defendant's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA, since Defendant is still representing that the Products have characteristics which they do not have.

89.    Pursuant to California Civil Code section 1782(d), Plaintiff and the members of the Class seek an order enjoining Defendant from engaging in the methods, acts, and practices alleged herein. Plaintiff also seeks actual damages,

CLASS ACTION COMPLAINT

punitive damages, and attorneys' fees and costs for Defendant's violations of the CLRA.

90.     Pursuant to California Civil Code section 1782, on December 11, 2024, a written demand letter was sent to Defendant on behalf of putative class of California consumers, requesting that Defendant remedy the violations alleged herein. More than thirty days have passed since Defendant received the demand letter. Defendant refused to take any corrective action. Instead, Defendant responded that the claims were without merit because "there is no way to determine whether silicon is 'artificial' or naturally occurring." This is not true. As explained above, numerous published articles and Silicone Dioxide suppliers explain that the substance is artificial, and Plaintiff's counsel's investigation has concluded that the Silicon Dioxide in the Products is artificially made.  If the Products truly contained non-artificial Silicon Dioxide, Defendant could have simply provided the documentation and avoided this lawsuit. Defendant's actions strongly indicate that the Silicon Dioxide in the Products is in fact artificial, and Defendant has decided to continue selling the Product with the deceptive Representation. Thus, this Complaint seeks actual and punitive damages in addition to injunctive relief, and attorneys' fees and costs for Defendant's violations of the CLRA.

91.     Pursuant to section 1780(d) of the CLRA, below is an affidavit showing that this action was commenced in a proper forum.

## SECOND CLAIM FOR RELIEF

### Violation of California's Unfair Competition Law

### Cal. Bus. & Prof. Code §§ 17200, *et seq.*

92.     Plaintiff realleges and incorporates by reference all allegations

contained in this complaint, as though fully set forth herein.

93.    Plaintiff brings this claim under the UCL individually and on behalf of the California Subclass against Defendant.

94.    The UCL prohibits any "unlawful," "fraudulent," or "unfair" business act or practice and any false or misleading advertising.

95.    Defendant committed unlawful business acts or practices by making the Representation and omitted material facts (which constitutes advertising within the meaning of California Business & Professions Code section 17200), as set forth more fully herein, and by violating California's Consumers Legal Remedies Act, Cal. Civ. Code §§17500, *et seq.*, California's False Advertising Law, Cal. Bus. & Prof. § 17500, *et seq.*, 15 U.S.C. § 45, and by breaching express warranties.

96.    Plaintiff, individually and on behalf of the other Class members, reserves the right to allege other violations of law, which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this date.

97.    Defendant committed "unfair" business acts or practices by: (1) engaging in conduct where the utility of such conduct is outweighed by the harm to Plaintiff and the members of the a Class; (2) engaging in conduct that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiff and the members of the Class; and (3) engaging in conduct that undermines or violates the intent of the consumer protection laws alleged herein.

98.    There is no societal benefit from deceptive advertising.

99.    Plaintiff and the other Class members paid for a Product that is not as advertised by Defendant. Further, Defendant failed to disclose a material fact (that the Products contain an artificial preservative) of which it had exclusive knowledge. While Plaintiff and the other Class members were harmed, Defendant was unjustly enriched by its false misrepresentations and material omissions. As

a result, Defendant's conduct is "unfair," as it offended an established public policy. There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.

100.    Defendant committed "fraudulent" business acts or practices by making the representations of material fact regarding the Products set forth herein. Defendant's business practices as alleged are "fraudulent" under the UCL because they are likely to deceive customers into believing the Products actually contain no artificial preservatives.

101.    Plaintiff and the other members of the Class have in fact been deceived as a result of their reliance on Defendant's material Representation and omissions. This reliance has caused harm to Plaintiff and the other members of the Class, each of whom purchased Defendant's Products. Plaintiff and the other Class members have suffered injury in fact and lost money as a result of purchasing the Products and Defendant's unlawful, unfair, and fraudulent practices.

102.    Defendant's wrongful business practices and violations of the UCL are ongoing.

103.    Plaintiff and the Class seek pre-judgment interest as a direct and proximate result of Defendant's unfair and fraudulent business conduct. The amount on which interest is to be calculated is a sum certain and capable of calculation, and Plaintiff and the Class seek interest in an amount according to proof.

104.    Unless restrained and enjoined, Defendant will continue to engage in the above-described conduct. Accordingly, injunctive relief is appropriate.

105.    Pursuant to California Business & Professions Code section 17203, Plaintiff, individually and on behalf of the Class, seeks (1) restitution from Defendant of all money obtained from Plaintiff and the other Class members as a

result of unfair competition; (2) an injunction prohibiting Defendant from continuing such practices in the State of California that do not comply with California law; and (3) all other relief this Court deems appropriate, consistent with California Business & Professions Code section 17203.

<u>**THIRD CLAIM FOR RELIEF**</u>

**Breach of Express Warranty**

106.   Plaintiff realleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

107.   Plaintiff brings this claim for breach of express warranty individually and on behalf of the Nationwide Class and California Subclass against Defendant.

108.   As the manufacturer, marketer, distributor, and seller of the Products, Defendant issued an express warranty by representing to consumers at the point of purchase that the Products followed the Representation.

109.   Plaintiff and the Class reasonably relied on Defendant's misrepresentations, descriptions and specifications regarding the Products, including the Representation.

110.   Defendant's Representation was part of the description of the goods and the bargain upon which the goods were offered for sale and purchased by Plaintiff and Members of the Class.

111.   In fact, the Product does not conform to Defendant's Representation because the Products contain an artificial preservative. By falsely representing the Products in this way, Defendant breached express warranties.

112.   Plaintiff relied on Defendant's (the manufacturer) Representation on the Products' labels and advertising materials which provide the basis for an express warranty under common law.

113.   As a direct and proximate result of Defendant's breach, Plaintiff and Members of the Class were injured because they: (1) paid money for the Products

that were not what Defendant represented; (2) were deprived of the benefit of the bargain because the  Products they purchased were different than Defendant advertised; and (3) were deprived of the benefit of the bargain because the Products they purchased had less value than if Defendant's Representation about the characteristics of the  Products was truthful.

114.   Had Defendant not breached the express warranty by making the false Representation alleged herein, Plaintiff and Class Members would not have purchased the Products or would not have paid as much as they did for them.

### REQUEST FOR RELIEF

Plaintiff, individually, and on behalf of all others similarly situated, request for relief pursuant to each claim set forth in this complaint, as follows:

a.      Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as the Class Representative and appointing the undersigned counsel as Class Counsel;

b.      Ordering restitution and disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiff and the Class members as a result of Defendant's unlawful, unfair, and fraudulent business practices;

c.      Ordering injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein, and ordering Defendant to engage in a corrective advertising campaign;

d.      Ordering damages in amount which is different than that calculated for restitution for Plaintiff and the Class;

e.      Ordering Defendant to pay attorneys' fees and litigation costs to Plaintiff and the other members of the Class;

f.      Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded; and

g.      Ordering such other and further relief as may be just and proper.

CLASS ACTION COMPLAINT

**JURY DEMAND**

Plaintiff hereby demands a trial by jury of all claims in this Complaint so triable.

Dated: April 24, 2025                    Crosner Legal, P.C.

                                         By:       */s/ Craig W. Straub*
                                                   Craig W. Straub

                                         9440 Santa Monica Blvd. Suite 301
                                         Beverly Hills, CA 90210
                                         Tel: (866) 276-7637
                                         Fax: (310) 510-6429
                                         craig@crosnerlegal.com

                                         Attorneys for Plaintiff

**CLASS ACTION COMPLAINT**

## **<u>Affidavit Pursuant to Civil Code Section 1780(d)</u>**

I, CRAIG W. STRAUB, declare as follows:

1.    I am an attorney duly licensed to practice before all of the courts of the State of California. I am one of the counsel of record for Plaintiff.

2.    This declaration is made pursuant to § 1780(d) of the California Consumers Legal Remedies Act.

3.    Defendant has done, and is doing, business in California, including in this judicial district. Such business includes the marketing, promotion, distribution, and sale of the Products within the State of California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed April 24, 2025 at San Diego, California.


Crosner Legal, P.C.

By:      */s/ Craig W. Straub*

Craig W. Straub

9440 Santa Monica Blvd. Suite 301
Beverly Hills, CA 90210
Tel: (866) 276-7637
Fax: (310) 510-6429
craig@crosnerlegal.com

CLASS ACTION COMPLAINT